IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

LANCE CONWAY WOOD,   )
           )
     Plaintiff,  )  Case No. CV-04-99-C-BLW
           )
vs.         )  **MEMORANDUM ORDER**
           )
IDAHO DEPARTMENT OF   )
CORRECTIONS, et al.,    )
           )
     Defendants. )
_____ )

   Pending before the Court are various motions ripe for adjudication.  Having

reviewed the motions, responses, and replies, as well as the record in this case, the Court

finds that oral argument is unnecessary.  Accordingly, the Court enters the following

Order.

## INTRODUCTION

   Plaintiff, an inmate in the custody of the Idaho Department of Corrections (IDOC),

filed a civil rights Complaint alleging, among other related claims, that Defendants had

provided improper medical care for his eye, that Defendant Correctional Officer Martin

had sexually harassed and abused him, and that supervising Defendants failed to protect

him from Martin.  The allegations remaining at issue arise from his Second Amended

Complaint (Docket No. 13).

   The medical claims against Defendants Dr. Lundgren and Dr. Antonie have been

dismissed with prejudice, and a Rule 54(b) judgment has been entered.  The judgment has been affirmed on appeal.  *See Court of Appeals Order of December 7, 2006* (Docket No. 236).  Plaintiff's Claim I(B) (Hepatitis vaccines) has been dismissed against all Defendants, including the IDOC Defendants. All claims against Prison Health Services (PHS) Defendants Susan Whipple, Dr. Hill, and Debi Titus have been dismissed.

Plaintiff voluntarily dismissed all claims against Dr. Baillie, Defendant McCready, Defendant Shriver, Defendant Dorsey, and Defendant Lahie.  *See Plaintiff's Motion to Amend*, at p. 3 (Docket No. 189).   Plaintiff is also voluntarily dismissing Defendant Beauclair from Count VII.  *See id.*

Remaining are medical care claims against Prison Health Services (PHS), as well as various claims against the IDOC Defendants which are detailed herein below.

## REVIEW OF PRELIMINARY MOTIONS

**A.      Defendants' Motion to Take Deposition (Docket No. 175)**

Defendants' Motion to Take Deposition of Plaintiff is moot.  The Court previously granted Defendants' Motion allowing them to depose Plaintiff (see Docket Nos. 173 & 177), and Defendants have taken Plaintiff's Deposition.

**B.      Plaintiff's Motion for Reconsideration (Docket No. 179)**

Plaintiff filed a Motion for Reconsideration of the Order of March 16, 2006, alleging that the Court erred in dismissing, for failure to exhaust administrative remedies, the retaliation and confiscation of inmate statements claims against Defendant Thomason,

and the interference with eye care claim against Defendant Martin.

The Court has not yet issued a final order on these claims.  "As long as a district court has jurisdiction over the case, then it possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient." *City of Los Angeles, Harbor Division v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2001) (internal citation omitted).  On reconsideration, the courts may correct "simple mistakes," as well as alter "decisions based on shifting precedent, rather than waiting for the time-consuming, costly process of appeal."  *U.S. v. Martin*, 226 F.3d 1042, 1049 (9th Cir. 2000).  However, while a court "has the power to revisit prior decisions of its own . . . as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'"  *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988) (citation omitted).

Recently, the United States Supreme Court held in *Woodford v. Ngo*, 126 S. Ct. 2378, 2382 (2006), that "[e]xhaustion is no longer left to the discretion of the district court, but is mandatory."  *Id*. at 2382 (citing *Booth v. Churner*, 532 U.S. 731, 739 (2001)).  The *Woodford* opinion makes it clear that prisoners "must now exhaust all 'available remedies,' not just those that meet federal standards."  *Woodford*, 126 S. Ct. at 2382.

The *Ngo* Court noted that "proper" exhaustion of administrative remedies means that "a prisoner must complete the administrative review process in accordance with the

MEMORANDUM ORDER - 3

applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court." *Id.* at 2384.

Similarly, in *Jones v. Bock*, 127 S. Ct. 910 (2007), the Court clarified that, "[t]he level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Id.* at 923.   As a result, the *Jones v. Bock* Court concluded that because the prison's "procedures make no mention of naming particular officials, the Sixth Circuit's rule imposing such a prerequisite to proper exhaustion [was] unwarranted." *Id.*

Idaho's grievance procedure requires the inmate to first attempt to resolve the problem informally by using an Inmate Concern Form.  The instructions for this filing are as follows:

> The Concern Form must be handwritten.  Typed Concern Forms will not be accepted.  Staff should respond within seven (7) working days of receiving an Offender Concern Form.

*Affidavit of Debbie Walker*, Exhibit A, IDOC Directive No. 316.02.01.001, at p. 9 (Docket No. 146-3).

In this case, Plaintiff sent an Inmate Concern Form to Warden Foster asking him to investigate why Plaintiff was transferred and whether he could obtain copies of inmate statements in the possession of Defendant Thomason.  In light of the language in *Jones v. Bock* that the particular grievance policy governs how claims are exhausted, and in light of the Idaho Grievance Policy's nonspecific language regarding informal resolution of

claims, the Court concludes that Plaintiff *did* properly exhaust this claim.  The Warden had an opportunity to investigate the claims against Thomason, which included why Plaintiff was moved and whether Thomason had Plaintiff's evidence.  In addition, the Court will allow Plaintiff to proceed against Defendants Yordy, Wolf, and Atencio, who are alleged to have participated in the allegedly retaliatory transfer, based on *Jones v. Bock*.  The Court previously determined that Warden Foster did not respond to the Inmate Concern Form; had he investigated the allegations, he would have had an opportunity to determine the extent of staff involvement in the alleged violation.  *See Order of March 16, 2006*, at p. 12 (Docket No. 177).  The remainder of Plaintiff's Motion is without legal basis, as he admits that he did not properly exhaust the eye care claim against Defendant Martin.

**C.    Plaintiff's Motion to Expand Discovery (Docket No. 185) and Motion to Compel Discovery (Docket No. 186)**

In his Motion to Expand Discovery,  Plaintiff seeks to expand discovery as to all Defendants on Claims I, II, III, IV and V, arguing that they are not entitled to qualified immunity and that Defendants failed to assert a qualified immunity defense on Claims I, II, III, IV, and V in their last summary judgment motion.  Defendants argue that they are entitled to assert a qualified immunity defense on any claims, and cite to the Court's Order of March 30, 2005, where it granted Defendants' Motion for Summary Judgment on the merits of Claim I(B), and denied without prejudice the remainder of the Motion, which focused on qualified immunity defenses to Plaintiff's claims.  Defendants also

asserted a general qualified immunity defense in their Answer.

Defendants are correct that discovery should not be expanded until the Court has ruled on Defendants' Motion for Partial Summary Judgment (Docket No. 191), now pending before the Court.  After the Court resolves the pending Motions for Summary Judgment in this Order, it shall set a final discovery schedule.  Therefore, Plaintiff's Motion to Expand Discovery shall be granted in a limited manner, and Plaintiff's Motion to Compel Discovery is denied.

**D.      Plaintiff's Motion for Sanctions (Docket No. 187)**

Plaintiff requests the imposition of sanctions for Defendants' failure to provide him with discovery according to the Court's Order of August 8, 2004.  Plaintiff states that he mailed interrogatories to Defendants.  Defendants assert that they responded to the interrogatories and do not possess any documents in response to Plaintiff's requests for documents.  The Court considers these issues moot, as it shall set a schedule for all final disclosure and discovery at a later date.  At that time, any pending discovery requests and disputes can be addressed.

Plaintiff also provides Affidavits of two inmates.  The Affidavits address various retaliation claims.  The first states Defendant Thomason retaliated against him for failing to provide her with information about Wood in 2006.  The second inmate states that he observed a situation in which IDOC officers (not Defendants) appeared to be intimidating Plaintiff in 2006.

The Court concludes that such claims should be pursued in a separate legal action,

MEMORANDUM ORDER - 6

and that it is too late to add new claims to this case.  In this action, Plaintiff is free to call these inmates as witnesses and use their testimony as trial evidence if it is relevant to prove or disprove his remaining causes of action or as it may bear on credibility.

**E.      Plaintiff's Motion to Stay (Docket No. 207)**

Plaintiff requests that the Court stay this proceeding until Defendants comply with his discovery requests.  The Court is aware of the continuing difficulties Plaintiff has had with discovery, especially trying to obtain information from IDOC employees who are not parties to this action and from inmates housed at different facilities.  In addition, some of the discovery to which Plaintiff is entitled poses privacy or security concerns for Defendants and other IDOC employees.  Using an attorney as a "buffer" is the most practical way for a prisoner to use such evidence in his case without having personal access to it.  Therefore, the Court concludes that it shall stay this action while it again attempts to find pro bono or contingency fee counsel for Plaintiff.  The parties shall not file anything further in this case while it is stayed.

**F.      Plaintiff's Motion for Joinder (Docket No. 188)**

Plaintiff's Motion for Joinder requests that Correctional Officer Cheryl Davis be joined as a second plaintiff in this case.  However, because Officer Davis has not herself requested joinder, nor has she done so through an attorney, Plaintiff's request is without basis and shall be denied.

**G.      Plaintiff's Motion for Leave to Amend and Add Supplemental Pleadings (Docket No. 189)**

Plaintiff wishes to add new causes of action against existing Defendants and also new causes of action against new Defendants.  These causes of action relate to his more recent allegations that IDOC officials and employees have retaliated against him for filing and maintaining this lawsuit.  It is unclear whether these claims, including the new claims against existing Defendants, have been administratively exhausted.  Because this case is near its end, the Court will deny Plaintiff's Motion without prejudice to filing his retaliation claims in a new Complaint.

Plaintiff also states he wishes to dismiss Defendant Beauclair from Count VII, and to entirely dismiss Defendants Alice Lahie, Kent Shriver, and Jim Dorsey from Plaintiff's Second Amended Complaint.  The Court will dismiss these causes of action against these Defendants.

## H.  Defendants' Motion to File Excess Pages (Docket No. 190)

Defendants request that the Court allow them to file an over-length memorandum in support of their Motion for Partial Summary Judgment (Docket No. 191).  Because of the large number of issues raised in the Motion, the Court concludes that there is good cause for the request, and the Motion shall be granted.

## I.  Plaintiff's Motion for Extension of Time to Complete Discovery (Docket No. 193)

Plaintiff requests additional time to conduct discovery, stating that Defendants have yet to comply with the Court's previous Order requiring them to provide Plaintiff with certain documents and information.  The Court deems this motion moot, as it will

provide for additional discovery on the remaining claims as set forth in this order.

**J.      Plaintiff's Motion for Explanation of Proceedings (Docket No. 194)**

Plaintiff has asked for limited appointment of counsel to aid in taking depositions of Defendants and assistance at trial.  The Court has denied Plaintiff's prior request for counsel, and still has found no attorney willing to aid Plaintiff.  Plaintiff also asks for help from a law student, but the law school has declined to represent Plaintiff in this case, and so the Court does not consider that an option, as the law students must be supervised by the law school staff.  The Court will grant Plaintiff's Motion to the extent that it will stay this case while it conducts a search for pro bono or contingency fee counsel for Plaintiff. If the Court is again unable to find willing counsel, then it will make provisions for Plaintiff to obtain, to the extent possible, the information and documentation he needs for trial.

**K.      Plaintiff's Motion for Safeguard (Docket No. 195)**

Plaintiff requests that Cheryl Davis be required to produce her documents solely and directly to Plaintiff before she produces them to counsel for Defendants.  There is no provision in the rules to support such a request, and the Court does not see any factual circumstances that would make such a request appropriate in this case.  Therefore, the Motion is denied.

**L.      Plaintiff's Motion for Service of Subpoena (Docket No. 196)**

Plaintiff wishes to serve a subpoena on Cheryl Davis, who is an IDOC employee but not a party to this lawsuit.  Plaintiff asks Ms. Davis to produce her personnel file,

including evaluations of her work.  Defendants argue that Plaintiff is simply trying to harass Ms. Davis.  However, Defendants have admitted that it appears that Ms. Davis may have had a personal or romantic relationship with Plaintiff.  Therefore, under the broad rules of discovery, the Court finds Plaintiff's requests appropriate; however, to alleviate the prison's concerns about privacy and security, the Court will treat the subpoena as one addressed to the IDOC and have IDOC counsel produce the items in response to the subpoena to Plaintiff's new counsel, or, if counsel is not found, to the Court in camera.  Accordingly, Plaintiff's Motion is granted in part, and denied in part.

**M.**      **Plaintiff's Motion for Protective Order (Docket No. 197)**

Plaintiff requests that the Court issue an order stopping "all future attacks of calculated harassment, intimidation, and retaliatory conduct being inflicted upon Plaintiff's witnesses and Plaintiff by the IDOC and Defendants."  Plaintiff submits the Affidavits of two inmates who state that in April 26, 2006, they saw an unidentified man going through Plaintiff's papers in his cell when Plaintiff was not there.  *See Declarations of Jason Douglas and Jeremy Smith* (Docket Nos. 197-2 and 197-3).  In addition, Plaintiff submits an inmate's statement that IDOC employees were previously found to have retaliated against inmates for engaging in litigation in a June 17, 1999, Order issued by Judge Larry M. Boyle in *Gomez v. Spalding, et al.*, Case no. CV91-299-S-LMB.

The Court has determined that any new claims for retaliatory conduct may be brought in a new legal action after administrative remedies have been exhausted, but because this action is nearing completion, the Court will not entertain such claims in this

case.  As a result, this motion is denied without prejudice.

**N.      Defendant Shedd's Motion to Quash Interrogatories (Docket No. 200)**

Plaintiff has sent interrogatories to Defendant Shedd, which is inappropriate because Shedd is a witness, not a party.  As a result, the Motion to Quash is granted.  If the Court is unable to find counsel for Plaintiff, it shall set forth procedures for Plaintiff to obtain the information and documents he needs.

**O.      Plaintiff's Motion to File Excess Pages (Docket No. 208)**

Plaintiff requests that the Court allow him to file an oversized Memorandum in Support of Plaintiff's Response to IDOC Defendants' Motion for Partial Summary Judgment because of the large number of claims to address.  Good cause appearing, the Motion is granted.

**P.      Defendants' Motion for Protective Order (Docket No. 220)**

Defendants request a protective order, seeking to avoid answering Plaintiff's numerous pending motions until their Motion for Partial Summary Judgment is ruled upon.  They classify the motions as harassing and unreasonable.  The Court agrees that Plaintiff has filed several motions that are without legal basis.  However, Plaintiff is a layperson who is operating without a law library.  At the same time, the Court recognizes that Plaintiff's barrage of motions has caused much delay and unnecessary work for the Court, counsel, and the parties. Appointing counsel for Plaintiff will alleviate this problem.  Therefore, the Court shall consider this Motion moot.  Defendants need not answer any pending or further motions that Plaintiff has filed.

MEMORANDUM ORDER - 11

**Q.     Defendants' Motion to Strike (Docket No. 227)**

Plaintiff has filed the Declarations of Michael Larrow, Aaron Fodge, Raymond Roles, and Roy Roberts.  He does not specify that these Declarations are filed in support of any particular motion or response. Defendants have filed a Motion to Strike these Declarations on several grounds.

Michael Larrow's Declaration discusses his own relationship with Officer Martin, discusses observing Plaintiff's relationship with Officer Davis, and discusses his personal knowledge of various IDOC Defendants' and IDOC employees handling of these situations.  This information is relevant to the remaining Defendants and causes of action and shall not be stricken.  Aaron Fodge discusses his personal observation of Plaintiff's relationship with Officer Martin.  This, too, is relevant in the same way and shall not be stricken.

The Declaration of Raymond Roles alleges that ISCI retaliates against prisoners for exercising their First Amendment rights and states he has a retaliation claim pending. This Affidavit is of no value to this case.  If, however, Roles' retaliation claim is resolved in his favor, and if any of the defendants are common to Plaintiff's suit, it may become relevant.  If so, the Court shall consider it at a later date.  It need not be stricken at this time.

The Declaration of Roy Roberts discusses his personal observations of Officer Martin interacting with Plaintiff.  It is relevant to the remaining causes of action and shall not be stricken.

MEMORANDUM ORDER - 12

Inmates often do not have the means to keep evidence or declarations safe. Therefore, even though it would be improper for an attorney to file such declarations that do not specify that they support any particular pending motion or response, the Court allows pro se inmates to file such items. For these reasons, the Motion to Strike shall be denied.

**R.      Plaintiff's Motion for Sanctions (Docket No. 230)**

Plaintiff requests Rule 11 sanctions against Defendants for filing (1) their Motion for a Protective Order re: Plaintiff's Motions, (2) the Joinder in that Motion filed by the remaining Defendants, and (3) the Motion to Strike Declarations. Defendants' motions are not improper, and there are no grounds for sanctions.

**S.      Defendants' Motion to Strike Declaration (Docket No. 240)**

Defendants request that Plaintiff's Declaration in support of his Protective Order (Docket No. 238) be stricken. Because this Court is not going to entertain Plaintiff's retaliation claims in this action but shall require him to file a separate action, this Motion is moot.

**T.      Defendant's Motions to Strike Declaration (Docket Nos. 243 & 246)**

PHS moves to strike Plaintiff's Declarations (Docket Nos. 239 & 245) filed in support of his Motion for Sanctions and his Response to the PHS Motion for Summary Judgment. In Plaintiff's first Declaration, he states that he mailed concern forms and legal packets to various Defendants in an attempt to exhaust his administrative remedies. Exhaustion must occur prior to filing suit; a prisoner may not exhaust his administrative

remedies during the course of a civil rights action.  *McKinney v. Carey*, 311 F.3d 1198, 1199-2101 (9th Cir. 2002).  Therefore, the Declaration (Docket No. 239) is moot and the Motion to Strike the Declaration (Docket No. 243) is moot.

Plaintiffs' second Declaration is his statement that he was unable to obtain certain medical and prison records from Defendants, and therefore, he had to obtain them from other sources.  He requests that the Court consider the late filing because he asserts that Defendants failed to provide the items he had asked for in time to file them with his Response to the Motion for Summary Judgment.  Portions of his Declaration are argument rather than factual knowledge, and the Court shall consider them only as argument.  Other portions of the Affidavit are his own interpretation of exhibits; however, the exhibits speak for themselves.  Where there is no foundation for Plaintiff's interpretations, they will be disregarded.  Thus, striking the Declaration is unnecessary.  Because Plaintiff has been acting pro se and has had difficulty completing his own discovery, the Court shall excuse the late filing.

**U.  Plaintiff's Motion for Order to Show Cause (Docket No. 249)**

Plaintiff requests that the Court set a hearing date requiring Defendants to show cause why a protective order should not issue against them.  The Court will not issue an order to show cause regarding new allegedly retaliatory behavior in this three-year-old case, but shall do the following.  Plaintiff may file any retaliation claims in a separate Complaint after exhausting his administrative remedies.

**IDOC DEFENDANTS' MOTION**

# FOR PARTIAL SUMMARY JUDGMENT

## A.    Introduction

Defendants contend they are entitled to summary judgment on the following

claims:

Count I(a)    Eighth Amendment deliberate indifference to Plaintiff's iritis condition
against Foster and Thomason.

Count V    Eighth Amendment alleged failure to protect plaintiff from sexual abuse
against Yordy, Foster, and Thomason.

Count VI    First Amendment violation for alleged retaliatory transfer against Foster,
Thomason, Yordy, Wolf, and Atencio.

Count VII    First Amendment alleged retaliatory confiscation of evidence against
Yordy, Wolf, Atencio, and Thomason.[1]

## B.    Standard of Law for Summary Judgment Motions

Summary judgment is appropriate where "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those which may

affect the outcome of the case.  *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248

(1986).

In a motion for summary judgment, the moving party bears the "initial burden of

---

[1]  Count II, an alleged Eighth Amendment violation for alleged sexual abuse and
harassment against Martin, and Count III, an alleged Fourth Amendment right to privacy
violation for alleged repeated body searches and sexual harassment against Martin are not at
issue in the current Motion for Summary Judgment.

MEMORANDUM ORDER - 15

identifying for the court those portions of the record which demonstrate the absence of any genuine issues of material fact." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986)). If the moving party points to portions of the record demonstrating that there appears to be no genuine issue of material fact as to claims or defenses at issue, the burden of production shifts to the non-moving party. To meet its burden of production, the non-moving party "may not rest upon the mere allegations contained in his complaint, but he must set forth, by affidavits, exhibits or otherwise, specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56; *see T.W. Electric Serv.*, 809 F.2d at 630 (internal citation omitted).

The Court does not determine the credibility of affiants or weigh the evidence set forth by the non-moving party. All inferences that can be drawn from the evidence must be drawn in a light most favorable to the nonmoving party. *T.W. Elec. Serv.*, 809 F.2d at 630-31 (internal citation omitted). The Court is required, however, to determine whether the evidence set forth meets the requirements of Rule 56(c) and (e). In so doing, the Court is to look at admissibility of the *content* of the evidence, rather than the admissibility of the *form* of the evidence. *See Fonseca v. Sysco Food Service of Arizona*, 374 F.3d 840, 846 (9th Cir. 2004); *Block v. City of Los Angeles,* 253 F.3d 410, 418-19 (9th Cir. 2001) ("To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56."); *Fed. Deposit Ins. Corp. v. New*

MEMORANDUM ORDER - 16

*Hampshire Ins. Co.*, 953 F.2d 478, 485 (9th Cir. 1991) (same).  Declarations that contain

hearsay are admissible for summary judgment purposes if they "could be presented in an

admissible form at trial."  *Fraser v. Goodale*, 342 F.3d 1032, 1037 (9th Cir. 2003).

Rule 56(c) requires the Court to enter summary judgment "against a party who

fails to make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477

U.S. at 322.  The existence of a scintilla of evidence in support of the non-moving party's

position is insufficient.  Rather, "there must be evidence on which the jury could

reasonably find for the [non-moving party]."  *Anderson v. Liberty Lobby*, 477 U.S. at 252.

**B.      Count I(a): Eighth Amendment Deliberate Indifference Claim**

1.      <u>Standard of Law</u>

To prevail on an Eighth Amendment claim regarding prison medical care, Plaintiff

must show that prison officials' "acts or omissions [were] sufficiently harmful to

evidence deliberate indifference to serious medical needs."  *Hudson v. McMillian*, 503

U.S. 1, 8 (1992) (citing *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976)).  The Supreme

Court has opined that "[b]ecause society does not expect that prisoners will have

unqualified access to health care, deliberate indifference to medical needs amounts to an

Eighth Amendment violation only if those needs are 'serious.'"  *Id.*

> The Ninth Circuit has defined a "serious medical need" in the following ways:
> failure to treat a prisoner's condition [that] could result in further significant
> injury or the unnecessary and wanton infliction of pain; . . . [t]he existence
> of an injury that a reasonable doctor or patient would find important and
> worthy of comment or treatment; the presence of a medical condition that

significantly affects an individual's daily activities; or the existence of
chronic and substantial pain.

*McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds*,

*WMX Technologies, Inc. v. Miller,* 104 F.3d 1133 (9th Cir. 1997).

Deliberate indifference exists when an official knows of and disregards a serious

medical condition or when an official is "aware of facts from which the inference could

be drawn that a substantial risk of harm exists," and actually draws such an inference.

*Farmer v. Brennan,* 511 U.S. 825, 838 (1994). Differences in judgment between an

inmate and prison medical personnel regarding appropriate medical diagnosis and

treatment are not enough to establish a deliberate indifference claim.  *See Sanchez v. Vild*,

891 F.2d 240, 242 (9th Cir. 1989).

Mere indifference, medical malpractice, or negligence will not support a cause of

action under the Eighth Amendment.  *Broughton v. Cutter Lab*, 622 F.2d 458, 460 (9th

Cir. 1980).  A mere delay in treatment does not constitute a violation of the Eighth

Amendment, unless the delay causes serious harm.  *Wood v. Housewright*, 900 F.2d 1332,

1335 (9th Cir. 1990). The Ninth Circuit has clarified that if medical personnel have been

"consistently responsive to [the inmate's] medical needs, and there has been no showing

that the medical personnel had "subjective knowledge and conscious disregard of a

substantial risk of serious injury," summary judgment in favor of the defendants is proper.

*Toguchi v. Chung*, 391 F.3d 1051, 1061 (9th Cir. 2004).

In *Sanchez v. Vild*, the Court addressed the issue of an inmate's recurring medical

MEMORANDUM ORDER - 18

problem.  The *Sanchez* Court emphasized that "a difference of medical opinion"

regarding an inmate's treatment "does not amount to deliberate indifference to [that

inmate's] serious medical needs."  *Id*. at 242.  The rather unpleasant facts of that case are

as follows.

Sanchez brought an Eighth Amendment action against prison medical providers

"because of a recurring, chronic perirectal abscess."  In about November 1986, prior to

his transfer to prison, a jail doctor advised him that his condition would require surgery.

On December 26, 1986, he was treated at the prison for boils on his buttocks.  On January

12, 1987, Sanchez was treated for a ruptured boil.  The treatment for that boil was

successful, and he was free from boils until April 24, 1987.  Again, the problem was

resolved with treatment.

In approximately May 1987, June 1987, and August 1987, Sanchez's symptoms

recurred.  Each time he was treated, the symptoms abated.  He was referred to two outside

physicians in September 1987 for evaluation of the recurring problems.  The two

physicians did not recommend surgery.

The Ninth Circuit affirmed the district court's decision to grant summary judgment

in favor of the medical defendants in the case, reasoning:

> The basis of Sanchez' claim is that a prison doctor, during the course
> of treatment, advised him that surgery was necessary.  Prison officials, in
> their affidavits and moving papers in the district court, set forth the
> extensive degree to which Sanchez has received subsequent medical
> attention.  Sanchez has seen a physician's assistant, prison doctors, and
> outside physicians on numerous occasions.  He has received substantial
> treatment and medication for his ailments.  The treatment has cleared up the

MEMORANDUM ORDER - 19

symptoms of his ailments, which appear, however, to recur.  Subsequent
medical personnel have not recommended surgery.

At most, Sanchez has raised a difference of medical opinion
regarding his treatment.  A difference of opinion does not amount to a
deliberate indifference to Sanchez' serious medical condition.

*Id*. at 242.

In *Davalos v. Wheeler*, 2004 WL 719237 (D. Tex. 2004), the court confronted an

issue similar to that in Plaintiff's case.  Plaintiff had been given permission by the

optometrist to wear clip-on sunglasses outdoors because of light sensitivity.  He filed suit

because he was not allowed to wear them indoors.  He rested his argument on the fact that

historical medical records indicated that he could wear sunglasses indoors.  However,

nothing in his current medical file indicated that he had been authorized by a medical

provider to wear them indoors.  The Court determined that "[t]here is nothing to suggest

that Plaintiff was denied any prescribed treatment."  *Id*. at *4.   The facts did not show

that the defendants "refused to treat him, ignored his complaints, intentionally treated him

incorrectly, or engaged in any similar conduct that would clearly evince a wanton

disregard for any serious medical needs."  *Id*.

2.    Discussion

Plaintiff alleges that his Eighth Amendment right to proper medical care was

violated when Defendants Foster and Thomason were deliberately indifferent to

Plaintiff's iritis condition.  The Court previously addressed the iritis issue when it

determined the Prison Health Services (PHS) Defendants' First Motion for Summary

Judgment in its Order of March 30, 2005.  For the sake of continuity and efficiency, the

Court repeats here the relevant portions of that Order.

> a.    *Plaintiff's Description of his Iritis Condition*

Plaintiff has provided the following general background information on iritis:

> Iritis is the inflammation of the iris, the colored portion of the eye.  Iritis,
> which is often the result of a disease in another part of the body, can be a
> recurring condition.  A fairly common eye problem, iritis usually responds
> well to treatment.  However, the condition may become sight threatening
> when left untreated. . . . Symptoms of iritis [are] pain, tearing, light
> sensitivity, blurred vision, red eye, floaters, and small pupil. . . . The
> symptoms usually appear suddenly and develop rapidly over a few hours or
> days. . . .  A case of iritis usually lasts six to eight weeks. . . . When left
> untreated, iritis can cause a loss of sight.

*See Second Amended Complaint*, Exhibit J(j) to Second Amended Complaint (Docket

No. 13-2).[2]

> b.    *History of Iritis in 1998*

Plaintiff had several bouts of iritis from July 28, 1998, through October 1, 1998.

He was treated by Dr. Baldeck, an ophthalmologist, who prescribed eye drops, ointment,

glasses with tinted lenses, and UV-protection clip-on sunglasses for outdoor use.  After

some difficulty with ICI-O officials regarding the eyewear, Plaintiff was able to have his

family send in the appropriate eyewear.

> c.    *October 2, 1998 through May 19, 2002*

---

[2]The Court notes that, because this background information is very general and may not
necessarily be applicable to Plaintiff's particular condition, Plaintiff cannot rely on it to show
what particular care Plaintiff required.

Nothing in the record suggests that Plaintiff had any iritis symptoms during this time period of approximately four years.  On April 17, 2002, Plaintiff submitted a medical request form that stated simply, "Need refill on aspirin, getting headaches periodically throughout the day."  Plaintiff made no reference that he had any eye symptoms on that date or during this entire time period.

In 2002, Plaintiff's eyewear broke, and IDOC policy prevented him from having his family send in a replacement set.  Plaintiff saw Defendant Dr. Rick Lundgren, an optometrist, on May 20, 2002.  It is unclear whether Plaintiff had complained of iritis symptoms or whether he was simply attempting to obtain replacement eyewear.  On that date, Dr. Lundgren found no signs of iritis in Plaintiff's eyes.  Plaintiff made subjective complaints of photophobia, and so Dr. Lundgren offered to tint Plaintiff's regular glasses.

Plaintiff asked for a different type of glasses, but Dr. Lundgren said he was authorized to use only one type of prison-approved frames.  Plaintiff alleges that Nurse Whipple checked with security and said that only a minimum tint for Plaintiff's regular glasses was authorized by policy.  Dr. Lundgren ordered the minimum tint.

Plaintiff received the tint on his glasses, but found that it did not help.  About one month later, Debi Titus, PHS Administrator, told Plaintiff that he was authorized to have only the type of eyewear provided by Dr. Lundgren.  The record reflects no other complaints about his eyes between May 21, 2002, and March 1, 2003, a period of about nine months.

> ### d.    March 1, 2003 to June 12, 2003

On March 1, 2003, Plaintiff submitted a Medical Request Form that stated: "I would like to see the eye doctor.  The tint in my eyeglasses are too low, and I would like to know if their U.V. protective, and I would like an eye exame" (original wording preserved).  The PHS response of March 4, 2003, noted: "refer to optometry."  The Medical Request Form does not suggest that Plaintiff was suffering from any iritis symptoms.  Plaintiff did not complain of iritis symptoms between March 4, 2003, and June 12, 2003, a period of three months.  In total, there are no clear complaints of iritis symptoms between May 21, 2002, and June 12, 2003.

To summarize the foregoing, the Court notes that Plaintiff believes he was entitled to sunglasses in 2002 and 2003, because a doctor allowed him to have sunglasses in 1998 when he had two successive iritis bouts.  However, because he had been iritis-free for nearly five years, Plaintiff was not entitled to sunglasses where no current medical need was found. This period of time is similar to the *Davalos* case, *supra*, where the court did not allow the plaintiff to rely on past medical records, but concluded that his current medical records did not support his demand to be able to wear his sunglasses indoors. Under these circumstances, Plaintiff has not shown any deliberate indifference on the part of Foster or Thomason.

     *e.*     *June 12, 2003 through July 21, 2003*

On June 12, 2003,  Plaintiff's eye turned red and became very painful.  Plaintiff saw Dr. Hill, a prison medical doctor, on that date.  Plaintiff complained of light sensitivity and a history of iritis.  Dr. Hill did not make a diagnosis of iritis; his

MEMORANDUM ORDER - 23

observation note states "conjunctiva mildly infected OS [left eye]."  Dr. Hill instructed

Plaintiff to use the over-the-counter eye drops available at the commissary for his eye

condition.

Unaware of IDOC's policy against having medical items sent in from unauthorized

sources, Dr. Hill approved an order for Plaintiff to have a pair of sunglasses sent in to

him.  Administrator Debi Titus told Dr. Hill that the order was contrary to IDOC policy.

Dr. Hill or Administrator Titus then canceled the order.  The sunglasses were sent in, and

IDOC told Plaintiff to mail them out to his family.

On June 17, 2003, Dr. Hill authorized Plaintiff to use the sunglasses provided by

his family by issuing them to Plaintiff through the medical department.  He was unaware

that this method was also contrary to IDOC policy.  On June 25, 2003, Plaintiff filed a

concern form with Foster, informing him that the medical department had issued the

sunglasses and asserting that not having the sunglasses could cause serious risk to his

eyesight.  Defendant Shriver answered for Foster, denying the sunglasses.

On June 30, 2003, Defendant Kent Shriver answered the concern, noting that

Foster could override medical decisions; he attached a memo from Debi Titus showing

that glasses and other items could not be sent into the institution from family members,

but that state-prescribed glasses could be issued if the optometrist found it medically

necessary.  On July 3, 2003, Defendant Thomason denied Plaintiff's grievance regarding

the medical need for protective eyewear, stating, "You cannot have personal glasses sent

in.  If medical prescribes it, they purchase and issue it."  Defendant Allen reviewed and

affirmed the grievance, stating, "if medical desired an exception to the policy, it would

contact IDOC and seek that permission."   On July 7, 2003, a Deputy Warden reviewed

the Grievance and affirmed the denial of Plaintiff's claims.  On July 16, 2003, Warden

Foster performed a final review of the Grievance and affirmed the denial of Plaintiff's

claims.  He wrote:

> You will be provided glasses by medical.  You can't have personal glasses sent in.  If you need consideration while waiting for the medically issued glasses let them or myself know.

*Second Amended Complaint*, Exhibit A (Docket No. 13).  There is no record of Plaintiff

seeking an accommodation by letting the medical department or Warden Foster know of

an immediate need.

On July 21, 2003, Plaintiff had a second visit with Dr. Lundgren, the optometrist.

Dr. Lundgren found no sign of iritis, but offered to put a UV protective coating on

Plaintiff's glasses, but Plaintiff refused it.  Also on that date, Plaintiff complained in

writing to IDOC, and IDOC offered to put a darker tint and UV coating on his glasses.

Plaintiff refused.

The Court now considers the issue of whether Defendants Warden Foster or

Defendant Thomason were deliberately indifferent to Plaintiff's medical needs during this

time period.  Dr. Hill prescribed the sunglasses, albeit contrary to prison security policy.

Foster and Thomason refused to allow Plaintiff to have the sunglasses, but Foster

indicated on the Grievance review that Plaintiff's interim needs would be accommodated

if he asked.  There is no evidence that Plaintiff asked for an accommodation.  After

MEMORANDUM ORDER - 25

Plaintiff saw the optometrist and it was determined that he did not have active iritis, Plaintiff refused a higher tint on his glasses and refused a UV protective coating.

The Court concludes that Plaintiff has failed to show that Defendants were deliberately indifferent to Plaintiff's eye condition.  Within a reasonable time they fashioned a manner in which Plaintiff's medical need could be met, but Plaintiff failed to respond to the offer to accommodate his needs prior to his seeing the optometrist.  He also did not take advantage of offers to add a tint and UV protection to his existing glasses. Accordingly, the Court concludes that there is a genuine issue of material fact as to this time period, and summary judgment shall be granted in Defendants' favor.

**C.      Count V: Failure to Protect from Sexual Abuse**

Plaintiff alleges that his Eighth Amendment right to be protected during incarceration was violated when Yordy, Foster, and Thomason failed to protect plaintiff from sexual abuse by Defendant Martin.  Plaintiff reported the incident on July 20, 2003, when he filed an Inmate Concern Form.  Plaintiff was transferred to a different facility on July 29, 2003.  On July 31, 2003, the IDOC Office of Professional Standards (OPS) initiated an investigation into plaintiff's allegations of fraternization between Plaintiff and Martin.

Plaintiff alleges that Defendants knew about the relationship prior to his reporting it, and that they failed to act on that knowledge to protect him from Defendant Martin. Defendants argue that Plaintiff has no evidence to prove this allegation.  In his deposition, Plaintiff stated that Correctional Officer Townson stated that he and Martin (Taylor) were

MEMORANDUM ORDER - 26

"being looked at" prior to Plaintiff reporting the relationship, and that "administration" had likely seen Plaintiff and Martin having conversations. *Plaintiff's Deposition*, at pp. 212-15.

Because Plaintiff has come forward with some evidence and counsel may be able to better determine whether there is any additional evidence supporting this claim, the Court will deny without prejudice this portion of Defendants' Motion for Summary Judgment at this time, and it may be reasserted at a later date.

**D.      Count VI: Retaliatory Transfer**

Plaintiff alleges that Foster, Thomason, Yordy, Wolf, and Atencio violated his First Amendment rights when he was allegedly transferred for retaliatory reasons. Plaintiff had been incarcerated at ICI-O beginning in July 1995.  He reported the relationship with Martin on July 20, 2003.  He was transferred to Idaho State Correctional Institution (ISCI) on July 29, 2003.

A retaliation claim must allege the following: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005).

Kenneth Shriver, Business Operations Manager at ICI-O, has submitted a statement of the reasons Plaintiff was transferred:

> Plaintiff was transferred from ICI-O to ISCI on July 29, 2003, to

remove him from any potential harm or further improper conduct after he raised allegations of fraternization between himself and an ICI-O correctional officer.  After plaintiff was transferred, the IDOC learned that plaintiff and another correctional officer, Cheryl Davis, were involved in an inappropriate relationship.  This relationship would have also been reason to move plaintiff to ISCI if he had not already been moved.  Finally, plaintiff had been housed at ICI-O for a long enough period of time that he posed a security threat because of his knowledge of the prison operations.

*Affidavit of Kenneth Shriver*, at ¶ 25 (Docket No. 191-4).

Although Plaintiff argues that the length of his stay at ICI-O had nothing to do with the transfer, the Court finds that Plaintiff's allegation that Defendants failed to protect him from Defendant Martin is at odds with Plaintiff's objection to being transferred to a different facility so that Defendant Martin would not be able to have further contact with him.  Plaintiff alleges that Defendant Thomason said that she would not transfer him if he gave her the lock of Martin's hair and copies of Martin's letters or dropped his allegations.  Even if these allegations are true, the transfer reasonably advanced a legitimate correctional goal -- to distance Plaintiff from two female officers who were fraternizing with him contrary to IDOC policy.

Even though Plaintiff asserts that other retaliatory behavior occurred as a result of his reporting the Martin relationship, that does not affect the Court's finding and conclusion as to the transfer.  The Court will address other allegedly retaliatory conduct elsewhere in this Order.

**E.    Count VII: Retaliatory Search and Confiscation of Items**

    1.    <u>Factual Allegations</u>

Plaintiff alleges that Thomason, Yordy, Wolf, and Atencio violated his First Amendment rights when on two occasions they unlawfully confiscated items and searched his cell.  After prison officials learned of the relationship between Plaintiff and Martin, they began an Office of Professional Standards (OPS) investigation.  In the first investigation of October 31, 2003, Officer Yordy, then an OPS investigator, and another correctional officer searched Plaintiff's cell to look for letters, notes, cards, and other items sent between Plaintiff and Martin in response to Plaintiff's allegations of inappropriate conduct.  Plaintiff was not allowed to attend because he was "concerned and wanted to watch the search of his legal materials."  *Plaintiff's Brief*, Statement of Facts, at p. 2 (Docket No. 209-2).  He was asked to wait in the dayroom.  The cell searched lasted approximately 10 minutes and two letters from Correctional Officer Cheryl Davis to Plaintiff, and five letters Plaintiff was drafting to Davis were confiscated.  Officer Yordy told Plaintiff he was going to confiscate the seven letters, and Plaintiff became upset.  Yordy later returned the seven letters to Plaintiff.

On or about February 3, 2004, Steve Wolf, then an OPS investigator, Lieutenant Allen Lee, and Correctional Officer Steve Rowell, performed a second search of Plaintiff's cell, this time after Plaintiff's transfer to ISCI.  The cell search was performed to retrieve the two letters from Cheryl Davis to Plaintiff that had previously been confiscated and returned to Plaintiff.  The OPS wanted to conduct a forensic analysis of the letters, and the letters were subject to confiscation because they were considered contraband, being evidence of fraternization between an officer and an inmate.

MEMORANDUM ORDER - 29

Defendant Wolf does not recall handling any legal materials, as he does not recall any documents designated as legal documents, nor was he actively reading each document. Defendants assert that a cursory review of all of Plaintiff's documents was required to find the items relevant to the OPS investigation because inmates frequently hide contraband in stacks of documents.

During this cell search, the officers confiscated other contraband items unrelated to their investigation. The confiscated items were nine U.S.C.A. books, seven of which had another name crossed out or the identifying label torn off, and two of which appeared associated with the rest of the set. The books were considered "altered," in violation of facility rules, and therefore contraband.

### 2.    Calculated Harassment and Right to Privacy Allegations

The Court earlier identified some of Plaintiff's allegations as potentially fitting into the category of calculated harassment. Defendants had two legitimate reasons to conduct cell searches, Plaintiff's relationships with Officer Martin and Officer Davis. Because Defendants performed only two cell searches, both for legitimate reasons, Plaintiff's allegations do not arise to the level of calculated harassment.

The Court finds that the unusual circumstances and sensitive nature of the reason for the search justified any deviations from regular policy, directive, or post order, including the search of Plaintiff's legal materials without Plaintiff being present. *See Hudson v. Palmer*, 468 U.S. 517, 530, (1984) (inmates have no expectation of privacy in their living quarters); *Bell v. Wolfish*, 441 U.S. 520, 537 (1979) (prisoner's privacy rights

MEMORANDUM ORDER - 30

curtailed by prison's security interests).

Plaintiff has stated no particular damage suffered from these searches, has not provided any information about what his legal files contained, and has identified no potential advantage Defendants received as a result of searching his legal files.  *Cf. Gomez v. Vernon*, 255 F.3d 1118, 1132 (9th Cir. 2001).[3]  As a result of all of the foregoing, Plaintiff's cell search claims fail to rise to the level of a constitutional violation and are subject to summary judgment.  For this reason, the Court does not reach Defendants' qualified immunity argument.

    3.    <u>Confiscation of Lamps, Books, and Concern Form</u>

---

[3]  In *Gomez*, the Court characterized the documents taken from prisoners' files and copied by the State as follows:

> In the present case, the district court found that counsel implicitly authorized and encouraged department employees to search for and photocopy letters from opposing counsel that were kept in the inmates' legal files related to this case. This happened not once, or twice, but several times over the course of over nine months. The confidential status of the letters was facially evident-they were on legal letterhead easily identifiable as that of opposing counsel. One letter to an inmate even specified that it was "for your eyes only." But if that was not enough, the contents of the letters remove all doubt. They contained, in the words of the district court, a "summary of [plaintiffs' counsel's] analysis of the strengths of some of Plaintiffs' claims, settlement prospects and prospects for recovery at trial"-this at the same time that the parties were conducting settlement negotiations. The letters reviewed litigation strategy, theories of the case, and other sensitive issues. Further correspondence discussed the evidence available regarding "actual injuries resulting from [the Department's] alleged failure to provide constitutionally required access to the courts." In short, these documents were of the most sensitive kind-the kind that any trial lawyer would recognize as privileged, highly valuable, very confidential, and potentially devastating in the wrong hands.
>
> Thus, there can be no serious question that the material in the present case was privileged.

255 F.3d at 1132.

MEMORANDUM ORDER - 31

Plaintiff's claims that Defendants took a lamp and nine U.S.C.A. books that had the name of an attorney or inmate on them do not arise to the level of a constitutional violation.  Plaintiff may pursue damages for the return of these items as a supplemental jurisdiction state law claim (assuming he can show that they are not contraband), if he can show that he filed an Idaho Tort Claims Act notice.

Plaintiff also alleges that during the second search of his cell, Defendants took an Inmate Concern Form that he had written complaining about the impropriety of the first search.  Because Plaintiff has been allowed to pursue his search claims, and because the Court finds that no damage occurred as the result of the missing concern form, the claim is de minimis as a constitutional claim, and, because of lack of monetary value or damage, the Court declines to entertain it as a supplemental state law claim.

    4.    <u>Officer Cheryl Davis Letters</u>

Plaintiff's argument that the Davis letters were wrongfully confiscated when Defendants were investigating his relationship with Martin is not valid because the letters were evidence of an inappropriate fraternizing relationship.  Defendants should not have to ignore evidence of a newly-discovered inappropriate inmate-officer relationship while looking for evidence of a first inappropriate relationship.  Defendants later returned the evidence presumably because it was relevant to this legal action as part of Plaintiff's evidence.  Plaintiff suffered no damage and has stated no constitutional claim with these factual allegations.

    5.    <u>Claims Against Defendant Thomason</u>

MEMORANDUM ORDER - 32

Plaintiff asserts that Defendant Thomason confiscated some written inmate statements.  He has not stated whether she returned them or returned copies of them. Because this claim has been newly added back into this case on the Court's granting of Plaintiff's Motion to Reconsider, the Court shall deny summary judgment on this claim without prejudice to reassertion of the motion at a later date.

      6.      <u>Claims of Other Retaliatory Behavior</u>

Plaintiff asserts that Defendants intimidated and harassed Plaintiff during their interviews of him.  Generally, verbal harassment, abuse and threats, without more, are not sufficient to state a constitutional deprivation under § 1983.  *Oltarzewski v. Ruggiero*, 830 F.2d 136 (9th Cir. 1987) (allegations that correctional counselor told plaintiff that he would transfer him to a higher custody status unit if he tried to go to the law library and that he would be sorry if he filed a class action suit were not actionable under § 1983). Therefore, these allegations are not actionable.

As the Court explained above, Plaintiff can bring new retaliation claims in a separate legal action, but it is too late to add them here.

**PHS'S MOTION FOR SUMMARY JUDGMENT**

**A.    Facts**

The subparts of Claim I(a) remaining against PHS include Eighth Amendment medical deliberate indifference claims from the following time periods: (1) between August 2, 2003 and November 27, 2003; (2) between May 17, 2004 and July 14, 2004; and (3) after February 8, 2005.

MEMORANDUM ORDER - 33

Plaintiff asserts that he has not had been able to conduct the necessary discovery or file motions for reconsideration because he has no counsel.  Motions for reconsideration regarding his former claims against the PHS Defendants are now moot, as the Court of Appeals has affirmed this Court's orders regarding those claims.  Plaintiff asserts that he has been provided with only his institution medical records, and that he was not provided with the records of Dr. Anderson.  This allegation was made on January 18, 2006.  *See Response to PHS Motion for Summary Judgment* (Docket No. 170).  In response, Defendants assert that they provided the medical records from Dr. Anderson (LCW00439, 440, and 442) to Plaintiff, consistent with their Amended Notice of Compliance with the August 4, 2004 Court Order (Docket No. 141).  Defendant PHS ceased providing medical services to the prison on July 13, 2005.  *Affidavit of Larry Hynes*, at ¶ 2 (Docket No. 174-2).

Defendant also notes that Plaintiff has attached medical records from Dr. Anderson to Plaintiff's own declaration.  *See Plaintiff's Affidavit*, at Exhibit J (Docket No. 169).  Plaintiff asserts that he obtained these records directly from the provider and also obtained some PHS/IDOC policy statements from other inmates.  Based on all of the foregoing, the Court concludes that Plaintiff has been able to obtain the information he sought.

**B.**    **Law Applied to Civil Rights Claims Against Entities**

In this action, Plaintiff's remaining medical claims are against Prison Health Services, Inc (PHS).  In order to prevail against PHS as an entity, Plaintiff must meet the

MEMORANDUM ORDER - 34

test articulated in *Monell v. Dep't of Social Services of City of New York*, 436 U.S. 658,

691-94 (1978).[4]  Under *Monell*, requisite elements of a § 1983 claim against a

municipality or private entity performing a state function are the following: (1) the

plaintiff was deprived of a constitutional right; (2) the entity had a policy or custom; (3)

the policy or custom amounted to deliberate indifference to plaintiff's constitutional right;

and (4) the policy or custom was the moving force behind the constitutional violation.

*See Mabe v. San Bernardino County, Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110-11

(9th Cir. 2001).  An unwritten policy or custom must be so "persistent and widespread"

that it constitutes a "permanent and well settled [entity] policy."  *Monell*, 436 U.S. at 691.

"Liability for improper custom may not be predicated on isolated or sporadic incidents; it

must be founded upon practices of sufficient duration, frequency, and consistency that the

conduct has become a traditional method of carrying out policy."  *Trevino v. Gates*, 99

F.3d 911, 918 (9th Cir. 1996) (citations omitted).

## C.    Discussion

The IDOC Optometry Guidelines of PHS states, in pertinent part:

> The IDOC permits one eye examination and one pair
> of State issue eyeglasses every two years.  Please specify if
> requesting a repair or an exam.
>
> Inmates complaining of itching burning, or red eyes,
> headaches, migraines, eye injury or infection, dizziness,
> sudden onset of double or blurry vision or requesting eye

---

[4]*See, e.g., Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003) (cataloguing circuit court cases applying *Monell* to private entities).

MEMORANDUM ORDER - 35

drops for dry eyes or allergies, must submit a Health Services
Request to the assigned IDOC physician or provider and
attend sick call.  You will be referred to the Optometrist if the
physician or provider feels it is necessary.  Inmates with
Diabetes or eye diseases are referred for an eye exam
annually, or more frequently if indicated, by the Chronic Care
Clinic provider.

*Affidavit of Keely Duke*, Exhibit C (Docket No. 191-8).

Four days after his prison transfer, on August 2, 2003, Plaintiff complained that he

needed sunglasses to go outside, that his left eye was getting worse, and that he was still

in pain.  On August 4, 2003, a note from CMS Dawson on the Health Services Request

Form states, "no show," which means that Plaintiff did not come to a scheduled

appointment.  There is no evidence of a call-out sheet notifying Plaintiff of the

appointment, or other evidence that notice of the appointment was given to Plaintiff.

There is also an attached sheet from Secretary Malone stating: "The optometrist must

recommend the sunglasses.  Optometry appt. are about 6 wks out."  *See Plaintiff's*

*Response to Summary Judgment Motion*, Exhibits B & C, at pp. 8-10 (Docket No. 170-2).

According to PHS, Plaintiff should have sent in an Inmate Concern Form or "kite" if he

felt he needed eye care sooner than six weeks out.  *See Affidavit of Larry Hynes*, at ¶ 8

(Docket No. 174-2).  The statement does not address why no optometry appointment was

ever scheduled for Plaintiff based on Malone's response.

On September 8, 2003, and September 16, 2003, Plaintiff informed Dr. Baillie he

had requested a visit with the optometrist and had not yet been scheduled.  Plaintiff

alleges that Dr. Baillie told him that he would refer him to the optometrist.  Dr. Baillie did

MEMORANDUM ORDER - 36

not enter any notes in the medical records about Plaintiff's request for eye care.

On October 1, 2003, Plaintiff complained of constant eye pain and a recurrent history of iritis.  Dr. Baillie noted that there were no previous requests for evaluation of this problem in the medical records.  Dr. Baillie requested medical records from ICI-O and again stated that he would refer Plaintiff to an optometrist.

Plaintiff did not see an optometrist.  On November 28, 2003, he was seen by prison medical staff and provided with treatment for his eye.  About six months passed without any further complaints of eye problems.

On May 17, 2004, Plaintiff submitted a medical request to see the optometrist because he was again having eye problems and pain.  On June 7, 2004, Plaintiff submitted an Inmate Concern Form stating he had not yet been seen.  On June 23, 2004, during a visit to the medical department, Plaintiff told Dr. Baillie he wanted to have an eye examination for blurred vision, headaches, and photophobia.  Dr. Baillie authorized a visit to Dr. Sonntag, an ophthalmologist.

On June 29, 2004, PHS scheduled Plaintiff for an appointment with Dr. Sonntag on July 12, 2004.  On July 14 or 15, Dr. Sonntag examined Plaintiff, determined that his iritis was resolved, and prescribed no follow-up treatment.  The record reflects no symptoms of iritis for about four months, from July 14, 2004, to November 30, 2004.

Plaintiff was next examined by Dr. Tomey, a prison medical doctor, for iritis symptoms on December 7, 2004.  He was referred to an ophthalmologist.  On December 21, 2004, Dr. Rebecca Haggard, PHS administrator in charge of specialist referrals,

agreed that Plaintiff should see a specialist other than the one already involved in this litigation.  On December 30, 2004, PHS made an appointment for Plaintiff to see an ophthalmologist on January 25, 2005.  Plaintiff's appointment was cancelled due to security problems on his tier.  His appointment was rescheduled to February 8, 2005.

At the February 8, 2005 appointment, Dr. Anderson, the ophthalmologist, prescribed two pairs of glasses, sunglasses for outside use and photochromic lenses for inside use.  A February 21, 2005, letter from Dr. Anderson to Dr. Haggard confirmed that Plaintiff should be given eye drops and a follow-up visit in four months.

On March 3, 2005, Plaintiff complained that he had not received the glasses or eye drops.  On March 9, 2005, Plaintiff was told that the glasses had been ordered on February 24, 2005, and that they take 2-3 weeks to be made.  The response did not address the eye drops.

Plaintiff received the glasses on March 11, 2005.  On March 16, 2005, Plaintiff filed a Grievance stating that the eye drops prescribed on February 18, 2005, were never provided to him, and the glasses were not the ones prescribed.

Plaintiff had a visit with Dr. Anderson on April 15, 2005.  Plaintiff was diagnosed with resolution of iritis in his left eye, but onset of iritis in his right eye.  He was prescribed medication, including eye drops.  On April 18, 2005, Dr. Anderson sent a letter to Dr. Blakeslee asking to have a follow-up visit with Plaintiff in one week.  On April 19, 2005, Defendants received the eye drops medication order from Dr. Anderson, and the medication was ordered on April 20, 2005.  Defendants did not schedule a follow-

up visit.

On April 22, 2005, Plaintiff sent in an Inmate Concern Form to the medical department stating that he had not been given the eye drops.  On April 24, 2005, the response was that the medical department had not received Dr. Anderson's medication order until the week following the April 15, 2005, visit, and, due to the special nature of the prescription, it had to be special ordered and took a longer time to obtain. On April 25, 2005, he was seen in the chronic care clinic.  This response still did not address that the eyedrops prescribed in February were never provided to him.

PHS argues that the foregoing facts do not show that the failure of PHS to provide initial medical appointments, follow-up medical appointments, and prescription medication were due to any of its written policies.  PHS is correct.  However, because of the pervasive recurring problems set forth in these facts, the Court concludes that there is a genuine issue of material fact as to whether PHS has a de facto policy or a well-settled practice of ignoring requests for medical care, ignoring requests for medications prescribed by specialists, and ignoring follow-up visits to specialists as recommended by those specialists.

In *Monell*, the Court made it clear that an entity can be held liable for an official policy or a widespread custom that "has not received formal approval through the body's official decisionmaking channels."  436 U.S. at 690-91.  A custom "generally implies a habitual practice or a course of action that characteristically is repeated under like circumstances." *Jones v. City of Chicago*, 787 F.2d 200, 204 (7th Cir. 1986).

In addition to showing the frequency and pattern of certain practices of an entity's employees, a showing under *Monell* requires that there be "'an affirmative link' between the custom at issue . . . and the constitutional deprivation alleged to cast blame on the [entity]." *Id*. at 204.  That means "there must be some knowledge or an awareness -- actual or imputed -- of the custom and its consequences showing the municipality's approval, acquiescence, or encouragement of the alleged constitutional violation." *Id*. at 204.

Here, Plaintiff has shown that he constantly complained in writing to PHS employees, such as the Prison Health Services Administrator, of the inadequacies of the system in providing timely and appropriate medical care for his recurring eye problems, and yet the problems in obtaining proper care persisted.  There is sufficient evidence under Rule 56 to show that PHS authorities had actual or imputed knowledge or an awareness that his medical needs were not being met.  There is a genuine issue of material fact as to PHS's liability on this claim from the time period between August 2, 2003 and July 13, 2005.  As a result, summary judgment is denied.

## ORDER

NOW THEREFORE IT IS HEREBY ORDERED:

A.     Defendants' Motion to Take Deposition (Docket No. 175) is MOOT.

B.     Plaintiff's Motion for Reconsideration (Docket No. 179) is GRANTED in part and DENIED in part as set forth herein above.

C.     Plaintiff's Motion to Expand Discovery (Docket No. 185) is GRANTED to the

MEMORANDUM ORDER - 40

extent set forth herein.

D.  Plaintiff's Motion to Compel Discovery (Docket No. 186) is DENIED.

E.  Plaintiff's Motion for Sanctions (Docket No. 187) is DENIED.

F.  Plaintiff's Motion for Joinder (Docket No. 188) is DENIED.

G.  Plaintiff's Motion to Amend and Add Supplemental Pleadings (Docket No. 189) is
    DENIED as to any additions of causes of action or parties; it is GRANTED as to
    Plaintiff's voluntary dismissal of existing Defendant Beauclair as to Count VII,
    and  Defendants Alice Lahie, Kent Shriver, and Jim Dorsey as to all claims against
    them.

H.  Defendants' Motion to File Excess Pages (Docket No. 190) is GRANTED.

I.  Plaintiff's Motion for Extension of Time to Complete Discovery (Docket No. 193)
    is GRANTED to the limited extent set forth herein.

J.  Plaintiff's Motion to Clarify (Docket No. 194) is GRANTED to the extent that the
    Court shall conduct another search for counsel for Plaintiff.

K.  Plaintiff's Motion for Safeguard (Docket No. 195) is DENIED.

L.  Plaintiff's Motion for Service of Subpoena to Cheryl Davis (Docket No. 196) is
    GRANTED in part and DENIED in part as specified herein.

M.  Plaintiff's Motion for Protective Order (Docket No. 197) is DENIED without
    prejudice.  Plaintiff shall bring any retaliation claims in a separate legal action after
    exhaustion of administrative remedies.

N.  Defendant Shedd's Motion to Quash Interrogatories (Docket No. 200) is

GRANTED.

O.    Plaintiff's Motion to Stay (Docket No. 207) is GRANTED.  No party shall file

motions in this case while it is stayed.  This case shall be administratively

terminated for internal court purposes only while this case is stayed.  The Court

will reopen the case under the same case number with no prejudice to any parties.

P.    Plaintiff's Motion to File Excess Pages (Docket No. 208) is GRANTED.

Q.    Defendants' Motion for Protective Order (Docket No. 220) is MOOT.

R.    Defendants' Motion to Strike (Docket No. 227) is DENIED.

S.    Plaintiff's Motion for Sanctions (Docket No. 230) is DENIED.

T.    Defendants' Motion to Strike Declaration (Docket No. 240) is MOOT.

U.    Defendants' First Motion to Strike Declaration (Docket No. 243) is MOOT, and

Defendants' Second Motion to Strike Declaration (Docket No. 246) is DENIED.

V.    Plaintiff's Motion for Order to Show Cause (Docket No. 249) is DENIED.

Plaintiff may file any retaliation claims in a separate Complaint after exhausting

his administrative remedies.

X.    PHS's Second Motion for Summary Judgment (Docket No. 154) is DENIED as to

the time periods between August 2, 2003 and July 13, 2005.

Y.    The IDOC Defendants' Motion for Partial Summary Judgment (Docket No. 191) is

GRANTED in part and DENIED in part as follows:

    (1)    It is granted as to Count I(a) against both remaining Defendants,

        Foster and Thomason.

(2)     It is denied without prejudice as to Count V against Defendants

        Beauclair,Yordy, Foster, and Thomason.

(3)     It is granted as to Count VI against Defendants Beauclair, Foster,

        Thomason, Yordy, Wolf, and Atencion.

(4)     It is granted as to Count VII against Defendants Yordy, Wolf,

Atencion, and denied without prejudice as to Defendant Thomason.



DATED:  **March 28, 2007**

Honorable B. Lynn Winmill
Chief U. S. District Judge